IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| MARKETSTAR CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>PROSPER BUSINESS DEVELOPMENT CORPORATION,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER<br><br><br><br>Case No. 2:07-CV-00132-DB |

On June 5, 2007, Plaintiff Marketstar Corporation ("Marketstar") and Defendant Prosper Business Development Corporation ("Prosper") stipulated to stay this case pending arbitration pursuant to their agreement. After conducting five days of hearings, the arbitrator issued a Final Award of Arbitration in favor of Prosper in the amount of $4,750,000 on January 23, 2009. On February 4, 2009, Prosper filed a Motion for Entry of Final Judgment with this Court and a Motion for Prejudgment Interest. In response, on February 17, 2009, Marketstar filed a Motion to Vacate Arbitration Award. The Court held a hearing covering these motions on July 27, 2009. At this hearing, Marketstar was represented by Michael L. Larsen and John Winship Read; Prosper was represented by George M. Haley, James E. Arnold, and James G. Vargo. After

1

consideration of the written briefs and oral arguments submitted by the parties, the Court enters the following Memorandum Decision and Order.

## I. Factual Background

This case arises out of a failed attempt by several entities involved in the marketing, advertising, and business development industries to cooperate with one another as agreed upon. In early 2004, Marketstar, a Utah-based sales and marketing outsourcing company (and wholly-owned subsidiary of Omnicom Group, Inc. ("Omnicom") the world's largest advertising conglomerate), began looking for a supplier of consumer market research and identified BIGresearch, LLC, a small marketing services company managed by Prosper, as a possible partner. Marketstar Memo. in Supp. of Motion to Vacate, at 5, dkt. 30 ((Mar. 18, 2009). Subsequently, on April 6, 2004, Marketstar entered into a Mutual Confidentiality Agreement ("MCA") with BIGresearch. That agreement acknowledged that both Marketstar and BIGresearch possessed "certain valuable knowledge, business plans, trade secrets, contacts and relationships, programs, methods, procedures, lists of customers and prospects, and other trade secrets or proprietary information ("Information") which may be furnished or become known to the parties of this Agreement." *Id.* at 10. The MCA provided that the parties had a mutual responsibility "not to disclose the Information to anyone, except to its employees who have a 'need to know,'" "not to use the Information to each other's detriment," and "not to circumvent any third party relationships that may exist to the others detriment." *Id.*

During this initial phase of the parties' budding relationship, Ryan Brock, Marketstar's Vice President of Strategy, became aware that Prosper had an established relationship to the

CITIC Group, an investment company owned and controlled by the Chinese government that was seeking investors in the areas of television, film, print media, and advertising. *Id.* at 11. Numerous discussions regarding a potential collaboration between Omnicom, Marketstar's parent corporation, and CITIC, Prosper's business partner, followed, which ultimately led Prosper to provide Marketstar with a detailed overview of business opportunities with CITIC and introduce Marketstar to the key decision makers at CITIC. Prosper, Memo. in Opp. to Motion to Vacate, at 4, dkt. 42 (Apr. 6, 2009). During this phase, Marketstar and Prosper also entered into a Strategic Marketing Alliance Agreement ("SMAA"), pursuant to which Prosper and BIGresearch developed and licensed three customized email video newsletters for Marketstar and provided other specified data research services. Marketstar Memo. in Supp., at 6-8. The SMAA incorporated the earlier agreed upon MCA by reference and also contained language indicating that the parties generally anticipated broader cooperation in the future, and "anticipate[d] that future agreements may be necessary to protect the jointly owned intellectual property that may be created under this Agreement." *Id.* at 7.

The anticipated broader level of cooperation was delayed until early 2005, when the possibility of facilitating a meeting between CITIC and Omnicom was revisited. *Id.* at 12. Later that year, on October 25, 2005, Prosper arranged a meeting at Omnicom's offices in New York to provide Marketstar, and others within the Omnicom conglomerate, the opportunity to meet CITIC's representatives. *Id.* at 12-13. At the conclusion of the meeting, CITIC's representative Yan Gang indicated that he desired a follow-up meeting with Omnicom. *Id.* at 13.

A flurry of emails, attempted and actual meetings, and proposed agreements between the

entities followed in the effort to set up a joint venture between Omnicom and CITIC. Marketstar and Prosper presented vastly divergent accounts of these interactions at the arbitration hearings. For example, Marketstar's position during the arbitration was that the information contained in the emails from Marketstar to Omnicom was passed by Prosper's consent, *see* Marketstar Reply, at 12, dkt. 48 (Mar. 20, 2009) (or not confidential because it was readily available on the internet, *see* Marketstar Memo. in Supp., at 32 n.11). By contrast, Prosper argued that information was passed in violation of the MCA's prohibition on using Prosper's confidential information in an effort to circumvent Prosper's third-party relationships. *See* Prosper Memo in Opp., at 7. Marketstar's position during the arbitration was that the meeting which was set up in China between Omnicom and CITIC but was cancelled because Prosper "engineered" its failure. *See* Marketstar Memo. in Supp., at 14. Prosper, on the other hand, indicated that it was cancelled because the parties recognized the impropriety of meeting without Prosper's involvement. *See* Prosper Memo. in Opp., at 8-9.  Marketstar's position during the arbitration was that the drafts of a new Business Development Agreement ("BDA") between Prosper and Omnicom were circulated because Prosper recognized that it would need to enter into an additional contractual agreement if it wanted a paid role in any future negotiations between CITIC and Omnicom. *See* Marketstar Memo. in Supp., at 14. Prosper, of course, took the position that those drafts were circulated because the parties understood that the deal could not go forward without Prosper. *See* Prosper Memo. in Opp., at 9.

   Working under the assumption that the BDA would soon be entered into, and relying on the relationship that was established under the SMAA and protected by the MCA, Prosper

arranged for another meeting between Omnicom and CITIC. Marketstar Memo. in Supp., at 15-16. Prosper received little feedback after this meeting, and subsequent negotiations between Omnicom and CITIC took place without Prosper's knowledge. Prosper Memo. in Opp., at 10. On June 2, 2006, Omnicom and CITIC entered into a Joint Venture Agreement. Marketstar Memo. in Supp., at 16. Prosper learned of this new venture in the newspaper and never received any compensation for its efforts in bringing the parties together. Marketstar justified its actions by noting that no agreement existed which provided for such compensation. *See* Marketstar Memo. in Supp., at 16. Prosper, on the other hand, believed that Marketstar was using Prosper's confidential information to circumvent Prosper in violation of the MCA. *See* Prosper Memo. in Opp., at 10.

Marketstar and Prosper were unable to resolve their dispute, and as a result, Prosper filed a Notice of Arbitration with the International Centre for Dispute Resolution on February 2, 2007, seeking to compel Marketstar or Omnicom to transfer an equity percentage in the joint venture. Complaint, exhibit 3, at 6, dkt.1 (Mar. 3, 2007). Shortly thereafter, on March 3, 2007, Marketstar filed the present action, seeking declaratory relief that no arbitrable controversy existed between Marketstar and Prosper and an injunction barring Prosper from proceeding with the arbitration. Complaint, ¶¶ 26-32. The parties subsequently agreed to stay the case pursuant to the arbitration provision of the MCA. Stipulated Motion, dkt. 10 (June 6, 2007).

Pursuant to that arbitration provision, the matter was submitted to the Honorable Joyce George, who served as both a trial and appellate court judge in Ohio's state court for 13 years, and after her retirement continued to receive assignments from the Ohio Supreme Court to

preside over commercial and contract cases. *See* Prosper Memo. in Opp., at. 22. As arbitrator in this dispute, she held a five-day hearing in Columbus, Ohio from December 1-5, 2008, during which each party was afforded ample opportunity to present evidence via numerous witnesses and exhibits. Final Order, at 1 (Jan. 23, 2009), Prosper Memo. in Supp. Of Entry of Judgment, ex. 1, dkt. 13 (Feb. 4, 2009).

After considering the evidence and the arguments presented by counsel, the arbitrator issued a Final Award of Arbitration in favor of Prosper in the amount of $4,750,000 on January 23, 2009. In her Final Order, the arbitrator held that the language of the SMA "is broad and reflects the parties' intent to allow the flexibility needed to explore business development opportunities and future transactions in China" and that "[i]t also anticipated entering into other agreements." Final Order, at 4. Critically, as regards to the scope of the agreements at issue, she held that "[a]lthough the initial transaction contemplated between the parties was narrow in scope, the China interest broadened the scope significantly and broadened the rights and responsibilities of the parties." *Id.* at 4-5.

This expansive view of the interplay of the contracts between Marketstar and Prosper allowed the arbitrator to conclude that Marketstar breached its agreement with Prosper in three ways. First, she concluded that Marketstar breached the MCA when it failed to protect Prosper's confidential information about CITIC's business by sharing that information with Omnicom. *Id.* at 17. Second, she also concluded that Marketstar breached the MCA by failing to advise Prosper that the proposed BDA would not be signed by Omnicom. *Id.* Finally, she concluded that Marketstar breached the MCA by permitting Omnicom to circumvent Prosper's third party

relationship with CITIC to Prosper's detriment. *Id.* Accordingly, the arbitrator found Marketstar liable for damages to Prosper resulting from these breaches.

In determining the damages award, the arbitrator relied heavily upon Prosper's expert, Dr. Oded Shenkar, Ph.D., to arrive at a reasonable damages calculation. *Id.* at 18-19. The arbitrator found Dr. Shenkar qualified as an expert in international business transactions under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Id.* at 13. Specifically, she found that his testimony was "reasonable, helpful, and reliable" because "Dr. Shenkar explained his methodology, the importance of a China connection, the facts he relied upon, the materials he reviewed and how he made his calculations to arrive at his damages opinion." *Id.*

Dr. Shenkar testified that entities that help facilitate joint ventures in China often receive up to 5% of the value of the transaction." Prosper Memo. in Supp., at 28 ("[M]ere introduction of a firm into a consummated business relationship will typically trigger a finder's fee which can range from 2 to 5 percent of the value of the transaction (often projecting five years forward or more.").

Dr. Shenkar calculated the value of the Omnicom-CITIC joint venture by first calculating the increase in Omnicom's revenues for the Asia-Pacific region from 2006-2007, the first full year of the joint venture. *Id.* at 28. That amount, $86.6 million, represented a 54% increase from the prior year. *Id.* Based upon his experience and expertise in the field of China business relations, Dr. Shenkar then determined that China represented at least one-third of the Asia-Pacific market, and that as a result, Omnicom enjoyed at least a $27.5 million increase in revenue in China alone. *Id.* Dr. Shenkar then projected the $27.5 million increase in Omnicom's

China revenue over a 5-year period, at a modest growth rate of 10%, resulting in a projected increase in revenue for Omnicom in China of $175 million for a 5-year period. *Id.*

Recognizing that Omnicom had some existing operations in China prior to the establishment of the joint venture with CITIC, Dr. Shenkar reduced the $175 million by half, attributing only half of Omnicom's growth in China to its newly-established relationship with CITIC ($87.5 million). *Id.* at 29. Dr. Shenkar further determined that this amount was consistent with the 54% increase Omnicom enjoyed during the first year of the joint venture, especially since Omnicom only had 7% and 15% increases in the prior two years. *Id.*

Dr. Shenkar also determined that the CITIC relationship would have additional value to Omnicom outside of China in the form of an increased ability to add and retain many multi-national businesses. *Id.* Dr. Shenkar determined that this increase and/or retention of business would result in approximately $25 million per year of additional revenue. *Id.* Projecting this amount at a modest growth rate of approximately 7%, Dr. Shenkar determined that the value of the introduction to CITIC would also add a projected increase of $150 million to Omnicom's world-wide revenue over the first five years of the joint venture. *Id.*

As a result, Dr. Shenkar testified that a total of $237 million dollars ($87.5 million plus $150 million) could be attributed to Omnicom's new relationship with CITIC. *Id.* at 29-30. Accordingly, he concluded that a reasonable finder's fee would be 5% of this figure, or $11.875 million. *Id.* Notably, Marketstar failed to present any expert testimony or an alternative calculation of damages. Final Order, at 15. Rather, it relied upon its own vigorous cross-examination of Dr. Shenkar and the testimony of Serge Dumont, the Senior Vice President of

Omnicom Group and President of Omnicom Asia Pacific, who was not qualified as an expert in the matter, which revealed that the joint venture suffered a revenue shortfall in its first full year of operations and that it had a negative net worth in 2007. *Id.* at 12, 15. These facts, however, appear to have already been incorporated in Dr. Shenkar's calculations, who found that the joint venture's revenues to be "a small consideration in the value of this transaction." *Id.*

After considering Dr. Shenkar's testimony, the Arbitrator asked Dr. Shenkar to recalculate Prosper's damages using a 2% finder's fee, which represented the percentage provided by Prosper's proposed BDA, without ruling in any way that the BDA was an enforceable agreement. This resulted in a new damage calculation of $4,750.000, which represented the amount the arbitrator ultimately ordered Marketstar to pay Prosper. Final Order, at 19.

## II. Discussion

Both parties are now before this Court, seeking to alter, or vacate completely, the arbitration award. The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, instituted a national policy favoring efficient resolution of disputes through voluntary arbitration agreements with minimal judicial intervention. *See Hall Street Assoc., L.L.C. v. Mattel, Inc.*, 128 S.Ct. 1396, 1405 (2008). As the parties readily admit, courts accordingly "must give extreme deference to the determination of the arbitration panel." *Sheldon v. Vermonty*, 269 F.3d 1202, 1206 (10th Cir. 2001) ("[T]he standard of review of arbitral awards is among the narrowest known to law." (quoting *Brown v. Coleman Co.*, 220 F.3d 1180, 1182 (10th Cir. 2000))). This narrow standard is appropriate because "[i]n consenting to arbitration, 'a party trades the procedures and

opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.'" *Bowen v. Amoco Pipeline Co.*, 254 F.3d 925, 932 (10th Cir. 2001) (quoting *Brown*, 220 F.3d at 1182)).

Accordingly, under section 9 of the FAA, a district court "*must* grant" an order confirming an arbitral award "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9 (emphasis added); *see also Hall Street*, 128 S.Ct. at 1405 ("There is nothing malleable about 'must grant,' which unequivocally tells courts to grant confirmation in all cases, except when one of the 'prescribed' exceptions applies."). Under 9 U.S.C. § 10, a district court may vacate an award,

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of the;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

In addition, an award may be modified or corrected under 9 U.S.C. § 11,

> (a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.
> (b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.
> (c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

Section 11 additionally states that the district court may modify and correct the award, so as to

effect the intent thereof and promote justice between the parties." *Id.*

The United States Supreme Court recently evaluated the exclusivity of the grounds listed in § 10 and § 11 in the context of a case in which the parties contracted to allow a district court to vacate, correct, or modify the award if the arbitrator's findings of facts were not supported by substantial evidence and/or if the arbitrator's conclusions of law were erroneous. *Hall Street*, 128 S.Ct. at 1400-01. Though *Hall Street* did not specifically address the propriety of a judicial expansion of § 10,[1] *see id.* at 1403-04 (referring to the "manifest disregard" standard as a "supposed judicial expansion of § 10), the *Hall Street* Court did engage in a lengthy statutory analysis of § 10 and § 11 before concluding, resoundingly, that those sections provide "the FAA's exclusive grounds for expedited vacatur and modification," *id.* at 1403.

The *Hall Street* Court first observed that the language of § 10 and § 11 "address[es] egregious departures from the parties' agreed upon arbitration." *Id.* at 1404 (noting that those sections use words such as "corruption," "fraud," "evident partiality," "misconduct," and "misbehavior" which are not "cut from the same cloth" as a mere mistake of law). Next, the Court noted that the language of § 9 "carries no hint of flexibility" because it provides the district court with no discretion to vacate, correct, or modify an arbitral order absent one of the grounds listed in § 10 or § 11. Finally, the Court stated that any other reading of the statute would "open[] the door to the full-bore legal and evidentiary appeals that can 'render informal

---

[1] The Court acknowledged the difference between a "supposed judicial expansion by interpretation," such as the manifest disregard standard, and a "private expansion by contract." *See Hall Street*, 128 S.Ct. at 1404. Furthermore, it observed that the manifest disregard standard could either represent a new ground for review or merely shorthand for the § 10 grounds, collectively. *Id.*

arbitration merely a prelude to a more cumbersome and time-consuming judicial review process,' and bring arbitration theory to grief in post-arbitration process." *Id.* at 1405 (quoting *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 998 (9th Cir. 2003)) (citations, internal quotations, and alterations omitted).

Marketstar argues that the judicially created "manifest disregard" standard nevertheless survives *Hall Street*, because the manifest disregard standard has long been recognized by the Tenth Circuit as an independent ground for vacating arbitration awards. *See, e.g.*, *Hollern v. Wachovia Securities, Inc.*, 458 F.3d 1169, 11,72, 1177 (10th Cir. 2006) (recognizing that a district court may vacate an arbitral award only for reasons enumerated in the Federal Arbitration Act or for "a handful of judicially-created reasons," including manifest disregard of the law); *Dominion Video Satellite, Inc. v. Echostar Satellite L.L.C.*, 430 F.3d 1269, 1275 ("In addition, we have acknowledged a judicially-created basis for vacating an award when the arbitrators acted in "manifest disregard" of the law."); *Bowen*, 254 F.3d at 932 (same); *Denver & Rio Grande Western R. Co. v. Union Pacific R. Co.*, 119 F.3d 847, 849 (10th Cir. 1997) (listing several judicially created exceptions to § 10).

The Tenth Circuit has yet to address any post-*Hall Street* viability of the manifest disregard standard. Of the circuit courts of appeal to address this issue, only the Sixth Circuit, in an unpublished opinion, held that the manifest disregard standard survived *Hall Street* as an independent ground for vacatur. *Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 Fed. App'x 415, 418-19 (6th Cir. 2008) (holding that *Hall Street* only limited private parties from supplementing the FAA's statutory grounds for vacatur by contract). By contrast, the First, Second, Fifth, and Ninth

12

Circuits have all concluded that *Hall Street* abolished the manifest disregard of the law standard as an independent ground for vacatur, and remained valid only as "shorthand" for the statutory grounds listed in the FAA. *See Citigroup Global Markets, Inc. v. Bacon*, 562 F.3d 349, 355 (5th Cir. 2009) ("[T]o the extent that manifest disregard of the law constitutes a nonstatutory ground for vacatur, it is no longer a basis for vacating awards under the FAA."); *Comedy Club Inc. v. Improv West Assocs.*, 553 F.3d 1277, 1290 (9th Cir. 2009) (recognizing that "the manifest disregard ground for vacatur is shorthand for a statutory ground under the FAA . . . which states that the court may vacate "where the arbitrators exceeded their powers"); *Ramos-Santiago v. United Parcel Serv.*, 524 F.3d 120, 124 n.3 (1st Cir. 2008) ("We acknowledge the Supreme Court's recent holding in *Hall Street* that manifest disregard of the law is not a valid ground for vacating or modifying an arbitral award in cases brought under the [FAA]."); *Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 93-95 (2d Cir. 2008) (reconceptualizing "manifest disregard" as a "judicial gloss on the specific grounds for vacatur enumerated in § 10").[2]

---

[2] One cannot help but question the utility of retaining the manifest disregard standard as "shorthand" in light of the difficultly district courts have in deciphering the meaning of that phrase. *See Citigroup Global Markets*, 562 F.3d at 354 (observing that "lower courts initially grappled with the uncertain implications of the [manifest disregard] clause"); *San Martine Compania De Navegacion, S.A. v. Saquenay Terminals Ltd.*, 293 F.2d 796, 802 n.4 (9th Cir. 1961) ("Frankly, the Supreme Court's use of the words 'manifest disregard,' [in *Wilko v. Swan*, 346 U.S. 427, 435-38 (1953)] has caused us trouble here."). The *Compania De Navegacion* court's reservations about the standard still ring true and are shared by this Court:

> Conceivable the words may have been used to indicate that whether an award may be set aside for errors of law would be a question of degree. Thus if the award was based upon a mistaken view of the law, but in their assumption of what the law was, the arbitrators had not gone too far afield, then the award would stand; but if the error is an egregious one, such as no sensible layman would be guilty of, then the award could be set aside. Such a 'degree of error' test would, we think, be most difficult to apply. Results would likely vary from judge

Under the facts of the present case, the Court need not enter this thicket, especially given the difficulty of meeting the Tenth Circuit's manifest disregard standard as it existed prior to the Supreme Court's decision in *Hall Street*. Indeed, like the § 10 grounds themselves, the manifest disregard standard articulated by the Tenth Circuit in the pre-*Hall Street* cases cited by Marketstar present an extremely high bar to vacatur. Under clearly established Tenth Circuit law, the manifest disregard standard requires "willful inattentiveness to the governing law." *ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1463 (10th Cir. 1995) (citing *Jenkins v. Prudential-Bache Sec. Inc.*, 847 F.2d 631, 634 (10 th Cir. 1988)). As a result, "[e]rrors in an arbitration panel's factual findings, or its interpretation and application of the law, do not justify vacating an award." *Hollern*, 458 F.3d at 1172 (citing *Denver & Rio Grande*, 119 F.3d at 849). Indeed, because that standard has always required a party to show that an arbitrator willfully disregarded the law, it is in substance already shorthand for § 10(a)(3) or § 10(a)(4), even though the words "independent" and "judicially created" still appear on its face. But regardless of how this Court conceptualizes and reconceptualizes the grounds for vacatur that survive *Hall Street*, Marketstar simply has not presented the Court with sufficient facts to demonstrate that any of the § 10 grounds are present or that the arbitrator manifestly and willfully disregarded the law by ruling

---

to judge.

923 F.2d at 802 n.4. The statutory language provided by the FAA itself provides better guidance than the judiciary's oft-repeated, after-applied gloss. Section 10 requires "corruption, fraud, or undue means," "evident partiality or corruption,"or "misconduct," on the part of an arbitrator, or a finding that an arbitrator "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10. The grounds for vacatur should be moored to these words, and not to the lackluster gloss of the manifest disregard standard.

in favor of Prosper.

Marketstar argues that the arbitrator exceeded her authority by ignoring Ohio Law requiring proof of reasonably certain future damages, and that the award failed to draw its essence from the agreement. Marketstar's theory that the $4,750,000 of damages awarded were speculative and that the scope of the MCA certainly did not extend to the Omnicom/CITIC joint venture may have a certain degree of validity. However, it is equally clear that the arbitrator carefully considered these theories, and the relevant Ohio law, before siding against them. The arbitrator's refusal to adopt Marketstar's theories does not amount to any willful disregard of the law on her part. To the contrary, she was presented with sufficient evidence to determine the scope of the various agreements between Marketstar and Prosper, and was also presented with sufficient evidence to determine the value of the misappropriated information used by Marketstar to circumvent Prosper's third-party relationship with CITIC. Final Order, at 13-15. Marketstar has provided no evidence that comes close to demonstrating any manifest or willful disregard of the law on the arbitrator's part, as those terms are interpreted by the Tenth Circuit. Similarly, there is no evidence that any of the § 10 factors apply in this case. Marketstar understandably would prefer this Court to revisit each of the arbitrator's rulings, but such review would defeat the clear rationale and purpose of the FAA. The legal theories argued by Prosper to the arbitrator provide at the very least an arguable basis for awarding Prosper $4,750,000 in compensatory damages and any mistake in the application or interpretation of the law is not a grounds for vacatur. There is no question that the parties received the benefit of the bargain: arbitration by a qualified arbitrator. Accordingly, the Court has no basis for vacating the arbitrator's award. As a

result, the Court DENIES Marketstar's Motion to Vacate the Arbitration Award and GRANTS Prosper's Motion for Entry of Final Judgment.

Prosper's Motion for Prejudgment Interest presents a related issue. After the Final Award was issued, Prosper filed a Motion for Prejudgment Interest with both the arbitrator and this Court. *See* Prosper Motion for Prejudgment Interest, dkt. 14 (Feb. 4, 2009); Order No. 15, Marketstar Opp. to Motion for Prejudgment Interest, dkt. 32, exhibit A (Mar. 18, 2009). On February 28, 2009, the arbitrator denied this motion for several reasons. First, she held that she no longer possessed the authority to consider Prosper's motion, because under the American Arbitration Association ("AAA") rules, she only retained authority to correct "clerical, typographical, or computational errors" after the issuance of a Final Award. Second, she held that she lacked the authority to reopen the hearing without the consent of both parties. Third, she held that under Ohio law, prejudgment interest is "limited to those contracts that provide for a payment of money that the breaching party failed to pay." Order No. 15, at 4. Specifically, the arbitrator found that under the facts of the present case, "there were no monies due and payable under the terms of the contract at the time of its breach." *Id.* Accordingly, she denied Prosper's motion for prejudgment interest.

Marketstar correctly construes Prosper's motion as a request for modification of an arbitration award and points to the language of the FAA as precluding Prosper's request. As noted above, under § 11, a district court's may only make such a modification or correction under three circumstances: (1) "Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the

award; (2) "Where the arbitrators have awarded upon a matter not submitted to them, unless it is

a matter not affecting the merits of the decision upon the matter submitted"; or (3) "Where the

award is imperfect in matter of form not affecting the merits of the controversy." 9 U.S.C. § 11.

Marketstar's position is supported by case law, which generally interprets the language of

§ 11 strictly. *See, e.g.*, *Apex Plumbing Supply, Inc. v. U.S. Supply Co., Inc.*, 142 F.3d 188, 194

(4th Cir. 1998). Furthermore, an award, or adjustment of an award, of pre-judgment interest is a

legal question which cannot be regarded as a mere mathematical miscalculation subject to

modification under § 11. *See, e.g.*, *Jeppsen v. Piper, Jaffray & Hopwood Inc.*, 879 F.Supp. 1130,

1139 (D. Utah 1995) (holding that the legal theories argued to the arbitration panel provided an

arguable basis for awarding pre-judgment interest and that any mistake in the application or

interpretation of that law is not a grounds to vacate the award). Finally, the parties agreed that

the Rules of the AAA would govern the arbitration, and, as the arbitrator noted, those rules

provide that the Arbitrator's award *may* include interest. Order No.15, at 1; Commercial

Arbitration Rules, R-43(a) (2005) ("The award of the arbitrator(s) *may* include . . . interest at

such rate and from such date as the arbitrator(s) may deem appropriate.") (emphases added).

Accordingly, the arbitrator correctly held that "once a proper claim for interest has been made,

the Arbitrator is satisfied that prejudgment interest is warranted and there is sufficient evidence

presented to fix the rate of interest and the date it is to commence, the Arbitrator has authority to

award it." Order No.15, at 2.

In the present case, Prosper failed to offer any evidence regarding prejudgment interest

during the arbitral process. Furthermore, even if it had, pre-judgment interest is not an

entitlement in every breach of contract action under Ohio law. Rather, the terms of the Ohio Revised Code § 1343.03 only require such interest to be paid when money becomes "due and payable" upon a contract. In *RPM, Inc. v.Oatey Co.*, an Ohio case also involving a breach of a confidentiality agreement, the Ohio Court of Appeals found the pre-judgment provisions of the Ohio Revised Code inapplicable because there was no "money due and payable" under the terms of the confidentiality agreement. Nos. 3283-M, 3289-M, 2005 WL 663057, at *15 (Mar. 23, 2005) ("There was no debt due under this contract. The contract at issue provided that RPM would disclose to Oatey information about PCI and, in return, that Oatey would keep the information confidential and use it only for purposes of evaluating a potential acquisition of PCI. Had both parties fully performed under the agreement, and had there been no breach by Oatey, no money would have been exchanged by these parties."). *But see Tharo Systems, Inc. v. Cab Produkttechnik GMBH & Co. KG*, 196 Fed. App'x 366 (6th Cir. 2006) (finding no abuse of discretion in the award of prejudgment interest on a contractually based "failure to provide information" claim).

Under the facts of the present case, the Court holds that modification of the arbitrator's award to include prejudgment interest is not warranted under the narrow exceptions listed in § 11. In the alternative, the Court holds that under the facts of the present case, such an award is not be justified under Ohio law. Accordingly, Prosper's Motion for Prejudgment Interest is DENIED.

### III. Conclusion

Based upon the foregoing, Marketstar's Motion to Vacate the Arbitration Award is

DENIED and Prosper's Motion for Entry of Final Judgment is GRANTED. In addition, Prosper's Motion for Prejudgment Interest is DENIED.

**IT IS SO ORDERED.**

DATED this 4th day of September, 2009.

Judge Dee Benson
United States District Court